DANIELS *et al.*, Executors, &c., *v.* THE ATLANTIC MUTUAL
INSURANCE COMPANY.

The owner of a ship, having chartered her for a voyage, effected insurance
upon the freight, earned or not earned. The ship was wrecked near her
port of discharge, and the insured abandoned the freight to the under-
writer. The seamen saved from the rigging, &c., enough to pay their
wages, and also part of the cargo, on which the freight was enough to
pay their wages: *Held,*
1. That the seamen were entitled to wages for the voyage, and not merely
from the time of the casualty. They take their pay as wages, and not
as salvage.
2. The wages, upon the abandonment, became a charge upon the ship and
owner, in exoneration of the freight.

APPEAL from the Superior Court of the city of New York.
The defendant, by its policy, dated 17th December, 1857,
insured George Daniels to the amount of $15,000 on freight,
valued at $25,000, earned or not earned, in the ship Flying
Dutchman, at and from San Francisco to New York. The
vessel was under charter to Moore & Folger for the voyage,
at $10,000, payable on arrival at the port of discharge. The
master was to sign bills of lading for the cargo at any required
rate of freight, without prejudice to the charter. The ship
sailed from San Francisco on the 1st day of November, 1857,
with a cargo, the freight upon which, according to the bills of
lading, amounted to $14,591.78, and was wrecked on the
New Jersey coast in the course of the voyage on the 14th day
of February, 1858. The assured abandoned the freight to
the defendant on the 16th day of February, 1858; and the
abandonment was renewed and confirmed upon the receipt
of further intelligence from the vessel on the 24th day of
February, 1858, and was accepted by the defendant, who paid
to the assured, on account of the loss, $12,500, leaving unpaid
the sum of $2,500; for which sum, reduced by freight saved
by the insured over and above seamen's wages to $2,377.29,
this action was brought. The crew remained by the wreck,
and aided in saving the property so long as there was anything

for them to do, and were then discharged. Portions of the cargo were saved and brought into port, the value of which was $11,727.72; and the freight upon which was $4,276.17, over and above the salvage charges and expenses. Parts of the vessel were also saved, and produced on a sale thereof the net sum of $3,169.63. The seamen's wages for the voyage were $2,397.91. Daniels, the assured, collected the freight, and the proceeds of the remnants of the vessel, acting for whom it might concern. The freight collected was apportioned between the defendant, representing the ship-owner and the charterers, in the proportion of $10,000 to $14,591.78, which gave $2,930.53 to the ship-owner. Out of this sum, the ship-owner paid the seamen's wages, leaving $532.14 as the net freight, which was credited to the defendant on account of the loss. The application of the freight earned, or any part of it, to the payment of seamen's wages for the voyage was resisted by the defendant, who claimed to be entitled to the whole freight as abandoned. The action was tried in the Superior Court of the city of New York before WHITE, J., and a jury; and a verdict was directed for the whole amount claimed by the plaintiffs, on the ground that, under the abandonment, the defendants took the freight subject to the lien thereon for seamen's wages, if freight should be earned to the amount of such wages, or to such amount as should be saved less than such wages. Exceptions were taken by the defendant to the rulings of the judge upon the trial; and upon the argument thereof, at the general term of the court, a new trial was granted. From the order granting such new trial the plaintiffs appealed to this court, stipulating that, if such order should be affirmed, judgment absolute should be given against them.

*Edward H. Owen,* for the appellants.

*Daniel Lord,* for the respondent.

ALLEN, J. The general rule of the maritime law is that seamen are not entitled to wages, unless freight is earned in

the voyage; and this, whether the hiring is for the voyage or by the month. If the loss of the voyage and freight is attributable to the act or default of the master or owners, the general rule will not apply. The right to wages is made to depend upon the completion of the voyage, in order to secure the fidelity and stimulate the zeal and attention of the mariners. It is also said, that public interests require that the fate of the seaman should be connected with that of the vessel. (Abbott on Ship., Story & Perkins' ed., 638; *Van Beuren* v. *Nelson*, 9 Cow., 158; 1 Pet. Ad., 194.) If the vessel be lost, although some part of the cargo be taken out of her by the seamen and saved, still no wages will be earned by the crew, for the reason that, the ship not being saved, no freight is earned. Perhaps, in such case, the mariner could recover an equitable compensation in the nature of salvage. (*Dunnett* v. *Tomhagen*, 3 Johns., 154.) Hence, freight is said to be the mother of wages, and the safety of the ship the mother of freight: a maxim expressing the connection in law between the earning of freight by the vessel and the right of the mariner to recover wages from any source. If the seaman becomes entitled to wages, he is not confined to the freight, nor is that declared to be the primary fund for their payment. It is said to be the most natural fund out of which the wages are contemplated to be paid; and it is relied upon by the master as the fund from which to discharge his personal responsibility for disbursements and wages. (*Sheppard* v. *Taylor*, 5 Pet., 675.) The same may be said of the earnings of a factory, or the products of a farm. They are the most natural fund for the payment of the operatives and laborers. The 13th rule in admiralty best declares what was recognized as the law without the rule. That rule is to the effect that, in all suits for mariners' wages, the libellant may proceed against the ship, freight and master, or against the ship and freight, or against the owner or master alone *in personam.*

That the ship, as well as the freight, is bound for the seamen's wages, is well settled; and no distinction is made between the two liens which would charge the freight in priority to, and

in discharge of, the vessel. (*Sheppard* v. *Taylor, supra; Lewis* v. *The Elizabeth & Jane,* Ware, 41; *The Dawn,* Davies, 121; *The Louisa Bertha,* 1 Eng. L. & Eq., 665; *The Lady Durham,* 3 Hagg. Ad., 196.) It certainly cannot be said, with propriety, that either of two funds is the primary fund for the pay- ment of a charge, when the lien-holder may proceed against either or both, at his option, or against both with the individual personally liable for the payment of the claim, or against such individual alone. When it is said that "the contract of the sailors is a species of copartnership between them and the owners," it is only meant that the profits of the one and the wages of the other are at risk upon the same hazard, and depend upon the same contingency; and when it is said that the freight earned and received constitutes a common stock, and, in the hands of the owners, is a trust-fund, to be accounted for to those whose industry produces it, nothing more is intended than that the earning of freight gives the right to wages; that the freight is one of the funds upon which the lien for wages attaches; and that the equity of the mariner would attach to this fund in the hands of the ship-owner. It is not intended that the technical relation of trustee and *cestui que trust* exists, or that the ship-owner can be called to an account as for a trust-fund.

Judge STORY, in *Sheppard* v. *Taylor* (*supra*), gives the sub- stance of the rule, when he says that "there is an intimate connection between the freight and the wages, and the right to the one is generally, though not universally, dependent on the other;" and this connection "has given rise to the quaint expression, that freight is the mother of wages."

Wages, then, are not chargeable upon the freight, in exone- ration of the ship or the master or owner, or as a fund first or primarily to be resorted to. As between the underwriter upon the ship, who, as the abandonee thereof, is entitled to salvage, and the owner, who has abandoned to the underwriter, there is great propriety, in adjusting their respective personal rights and equities, that the wages of the crew should be first charged upon the freight. But this does not affect the general

question of the mariners' lien upon the ship and freight *in solido.*

The crew of the Flying Dutchman, staying by the wreck and aiding to bring the vessel, with part of the cargo, into port, so that freight was earned by the vessel, became entitled to compensation for their services, not merely from the time of the casualty, but for the voyage. If that compensation was due them as salvors, then it should have been made a part of the general average of the expenses in saving the ship and cargo, or should have been charged upon the freight, or ship, or cargo, as a part of the salvage expenses. If the compensation was to salvors, as such, it would only be necessary, in adjusting the loss, to determine whether the amount should come into the general average or should be charged upon a particular interest. It would not, in that case, be chargeable upon the ship-owner personally, by reason of his hiring of the seamen as such. But, upon authority as well as upon principle, I am of the opinion that the compensation to the crew was as wages, and not in the nature of salvage. The question has more frequently arisen in cases where no part of the cargo has been saved, and consequently no freight earned, but where parts of a stranded ship have been saved, in part through the exertions of the seamen, and have been sold for more than sufficient to pay the wages of the seamen; and in England it is authoritatively settled that such a case constitutes an exception to the rule as to the earning of freight being a preliminary to the payment of wages, and that the seamen are entitled to wages if the salvage of the wreck is sufficient to pay them, and if not, to the amount saved. It is decided, and upon the same ground of reason and public policy that makes, in ordinary cases, freight the mother of wages, that the crew cannot assume the character of salvors of their own ship and claim for services as such. It is the duty of the crew to protect the ship through all perils, and their entire possible service is pledged to that extent; while a salvor is one who, without any particular relation to a ship, volunteers useful service to it in distress. An allowance to seamen as for salvage services

would be less beneficial and safe to the owners than the allowance of wages. In the latter case, there is no temptation to throw the ship into situations of danger, with a view to extravagant salvage. (*The Neptune*, 1 Hagg. Ad., 227; and see Lord STOWELL's judgment in the case.) Some of the American cases allow a compensation to seamen equivalent to their wages in case of shipwreck, where they do their duty and sufficient is saved for that purpose, "by way of salvage," or "upon the ground of a qualified salvage;" but the result is the same as that reached by Lord STOWELL in the case of the Neptune. The seamen are not treated as salvors, and, in substance, effect is given to the lien of the crew for their wages upon every part of the ship that is saved from the wreck, and the case made an exception to the rule that the earning of freight is a condition precedent to the receiving of wages, although this exception is not stated in words. (See the cases cited in note [1] to Abb. on Ship., Story & Perk. ed., 753, top paging, and especially *Lewis* v. *The Elizabeth & Jane, supra; The Dawn,* id.; *The Sophia,* 1 Gilp., 77.) The doctrine of Lord STOWELL was directly affirmed by the Supreme Court of the United States in *Hobart* v. *Drogan* (10 Pet., 110).

That freight is the subject of an abandonment, like any other subject of insurance, is not doubted; and it is not disputed that it is subject to all the incidents of other insurable interests when abandoned to the underwriters.

By an abandonment, when the right to abandon exists, or the abandonment is accepted by the insurer, the whole interest in all that remains of the thing insured, so far as it is covered by the policy, is transferred from the assured to the underwriters in proportion to the amount of their several interests. The thing or interest insured and thus transferred is called "the salvage." The insurer becomes entitled to the net salvage; that is, that which remains of the subject matter after payment of the expenses of saving it. (2 Arn. on Ins., 1178; per Lord ELLENBOROUGH, Ch. J., *Sharp* v. *Gladstone,* 7 East., 24.) The expenses of saving the cargo and bringing it into

Daniels *v.* The Atlantic Mutual Insurance Company.

port, from the time of the casualty or other interruption of the voyage which gives occasion to abandon, thus producing the freight, which is the salvage less the expenses, are properly chargeable upon the freight. These are the expenses incurred by or for the underwriter in the attempt to save something from the wreck for himself. What is saved belongs to the insurer, and not the insured; and, therefore, the expenses in the saving it are chargeable upon the former, although they exceed the value of the thing saved. But expenses incurred in and about the thing insured before the casualty, or in bringing it to the place of the casualty, are in no sense expenses incurred in saving the property from the peril insured against or pending the salvage. The maritime law gives the right to the insured to regard certain losses as total which are not absolutely total, and gives to the underwriter certain correlative rights; and among them, is the right of salvage. These losses are called constructively total; and, so far as the assured are concerned, the loss is total; for although the subject of the insurance is not actually destroyed, or wholly lost, he elects so to regard it, and exact of the insurer the full amount insured, giving to him what, if anything, can be saved. This rule is based upon reciprocal benefits to the insurer and insured. In consideration of the payment as for a total loss, when it is only constructively total, and incurring the risk and expense of saving the wreck, the underwriter becomes entitled to the thing saved, subject only to the charges in and about the saving it, and not subject to any other incumbrance. The fact that the insurer has been able to secure to himself the salvage to which he is entitled, does not give to the insured the right to charge him personally, or the property which he has thus purchased by accepting the abandonment, with any claim for services of mariners or others anterior to the wreck of the vessel. It is true, the right of the seamen to wages became fixed by the earning of freight, consequent upon the exertions of the defendant. But the wages were earned before the defendant acquired the title to the thing insured; and the earning of the

freight was only the happening of a contingency upon which the technical right to recover for such services depended. The wages were earned before the casualty, but, whether payable or not, depended upon the circumstance of earning freight, or saving a portion of the wreck of the vessel; but when the right to wages was established, they were chargeable upon the ship or the owner, rather than upon the freight transferred to the defendant. It being determined that the seamen recover wages as such, and not compensation as salvors, it follows that the amount paid them is no part of the salvage expenses, and ought not to be deducted from that which goes to the abandonee. The charge and lien of the crew do not spring or grow out of the perils insured against, and must therefore be discharged by the insured, or the insurers must be allowed or paid the sum they pay, or are bound to pay, by reason of these burdens, and to secure the salvage. The abandonees take the subject abandoned, whether freight, ship or cargo, free from all charges or incumbrances created by act of the master or owner. They take the ship free from any lien for seamen's wages earned before the time from which the abandonment takes effect, although, as we have seen, the parts saved are subject to a lien for such wages at the suit of the mariners, and no freight is earned. The underwriter, in adjusting the loss with the insured, is entitled to be allowed such sum as he may pay to release the ship from the lien. (2 Parsons' Mar. Law, 418; 2 Arnould on Ins., 1183.) As between the insured and the underwriter on the cargo of a ship, the latter is in no case responsible for the payment of freight, whether there be an abandonment or not. It is a charge on the cargo, against which he does not undertake to indemnify the owner; and the existence of a lien on the cargo for freight does not vary the legal responsibility of the underwriter on such cargo after the abandonment. (*Caze* v. *The Baltimore Ins. Co.*, 7 Cranch, 358.) So the wages of the mariner, so far as they are a charge on the freight, are not a charge against which the underwriter assumes to indemnify the insured, whether the freight is abandoned or not.

Daniels *v.* The Atlantic Mutual Insurance Company.

Mr. Arnould, in his Treatise, lays down the proposition that the abandonees of freight take as salvage the net proceeds of the freight ultimately earned, after deducting the cost of unloading the cargo on board, and the other "extra expenses of earning the freight rendered necessary by the casualty; but this does not include incumbrances or liens with which the property was burdened by the assured by contracts with third persons before the casualty took place, and not amongst the perils insured against." (2 Arn. on Ins., 1183.) *Barclay* v. *Stirling* (5 M. & S., 6), was the case of a policy on freight at and from the ship's port of loading at I. to her port of discharge, with leave to call at intermediate ports, beginning the adventure in the goods from the loading as aforesaid, with leave to discharge, exchange and take on board goods at any port she might call at, without being deemed a deviation, and it was held to cover the freight of goods loaded at an intermediate port; and, therefore, when the ship, having sailed with a cargo loaded at I., was, during the voyage, cast on shore at an intermediate port, and lost a part of her cargo, and arrived at her port of discharge and earned freight, it was held that the assured, who had abandoned to the underwriter upon intelligence of the loss, and had adjusted with him as for a total loss, was liable to the underwriter for the freight of that part of the cargo loaded at the intermediate port, after deducting the expenses attendant upon procuring such freight. Richardson, for the plaintiff (the underwriter), urged that, "as to any deductions from the amount of this freight in respect of charges incurred at the Havana, it seemed that the expenses of the voyage, wages, &c., are charges which belong to the owner of the ship, and are not, properly speaking, salvage on the freight, and, therefore, ought not to fall upon the plaintiffs." This was not controverted by his adversary. Lord ELLENBOROUGH, Ch. J., after showing that the freight from the Havana was covered by the policy, added: "All the cases agree that he (the insured) is accountable for the subsequently received freight (freight received after the payment as upon a total loss). He cannot have both indemnity and freight also.

Therefore the plaintiff is entitled in this case, deducting only such charges as belong to the freight, such as the expenses of loading the cargo, and the wages of the crew during the loading." BAILY, J., after considering whether the underwriter was entitled to the freight earned, said: "As to whether any deductions ought to be made, I think the charges incurred while the ship was detained merely for the purpose of getting repairs to enable her to complete her voyage ought to be set to the account of loss on ship for which the underwriter on ship will be liable. But as to any charges incurred while the ship waited at Cuba to obtain freight, or for the purpose of loading it when obtained, these ought, I think, to be deducted." HOLROYD, J., concurred. The court only charged the underwriter, or the freight earned, with the expenses incurred after abandonment in earning the freight.

*Sharp* v. *Gladstone* (7 East., 24), more directly decides the question made here. There, while a ship was forcibly detained in a foreign port, the owner abandoned the ship, and then the freight, to the different sets of underwriters thereon, who paid as for a total loss; after which the ship was liberated, reshipped her cargo, and returned home, earning freight, which was received by the assured. Assuming that the assured in that case could abandon the freight to an underwriter, who was an underwriter on the ship, which, as the ship was a seeking and not a chartered ship, was thought by the court to be questionable, the court held that the ship and freight were salvage to the different underwriters, after deducting the following expenses, which should be apportioned between them according to their several interests: 1. The expenses of ship and crew in the foreign port, including port charges (besides the expenses of shipping the cargo, which exclusively belonged to the underwriters on freight); 2. Insurance thereon; 3. Wages and provisions of crew from their liberation in the foreign port till their discharge here; 4. Wages (provisions were supplied by the foreign government) to the crew during their detention. But the assured was held not entitled to deduct out of the freight received, payable to the underwriter on freight, 1. Char-

ges paid at the port of discharge on ship and cargo; 2. Insurance on ship; 3. Diminution in value of ship and tackle by wear and tear on the voyage home. By Lord ELLENBOROUGH, Ch. J.: "The underwriters on freight, to whom it is abandoned, having paid as for a total loss, are entitled to the benefit of salvage; and the net salvage is that which remains of the subject-matter after payment of the expenses of saving it"— necessarily excluding wages of the crew for services prior to the happening of the event authorizing the abandonment.

The *Columbian Insurance Company* v. *Catlett* (12 Wheat., 383), in principle covers the case at bar; and the argument of Judge STORY is as applicable to the claim made by the plaintiffs here as to the defence interposed in that case. The decision was, that freight was not a charge upon the salvage of the cargo in the hands of the underwriter, whether the assured was the owner of the ship or not. Judge STORY said: "As between the owner of the ship and the owner of the cargo, the former has a lien upon the cargo for all the freight which becomes due and payable to him, whether it be full or *pro rata* freight. But freight is a charge on the cargo, against which the underwriters do not, in any event, whether of abandonment with salvage or of partial loss, undertake to indemnify the owner of the cargo. In order to obtain the salvage when in the hands of the ship-owner, it may become necessary for the underwriter to pay the amount of the freight for which they have a lien, as it may to pay any other charge created by the act of the owner of the cargo. But this does not change the nature or extent of the responsibility of the underwriters."

It is the gross freight that is insured, not the net freight, deducting the expenses of carrying it. (*Steves* v. *Columbian Ins. Co.*, 3 Caines, 43; 1 Arn. on Ins., 328); and if this had been a partial loss, or been so treated by the assured, and there had been no abandonment, the loss would have been adjusted with reference to the gross freight insured, without deducting for the wages of the crew or the provisioning of the ship in earning it; and the assured cannot be the gainer by availing himself of the right to abandon in the case of a constructive total loss.

Mr. Phillips, in his treatise on Insurance, dissents from the decision in *The Columbian Insurance Company* v. *Catlett*, and adopts the dissenting opinion of Judge JOHNSON, and asserts the better doctrine to be that, on abandonment of the cargo, the salvage comes into the hands of the underwriter, subject to the charges of freight for the voyage that is covered by the policy. The same views and the same line of argument led him to the conclusion that the underwriters on freight must take the salvage subject to the deduction of the lien of the seamen for wages for services on the voyage insured upon. (2 Phil. on Ins., 409, 412.) But as the first proposition is in direct conflict with authority, so the last is without authority for its support, and is adverse to the current of authority and the principles which control in analogous cases; and, respectable as the authority of Mr. Phillips is, his opinion cannot prevail against these odds.

Judgment of the court below must be affirmed and judgment absolute given against the plaintiff, and the case must be remitted to the court below, to ascertain the amount due the defendants upon their counterclaim.

WRIGHT, J. It must be admitted that, if the ship-owner is to receive from the insurers his full freight, and they are to pay the wages of the seamen, he will be in a better condition than if the voyage had been safely performed; as, in the latter event, he would have received the freight, but been bound for the wages. But this consequence is not a sufficient reason, in itself, for charging the ship-owner with the wages. In the case of an absolute, total loss of vessel and cargo, he would also have been a gainer to the extent of the wages; and yet, if that had been the result, he would have recovered the gross freight without any deduction for wages.

The wages of seamen are a lien or charge upon the ship and the freight earned. If ship and cargo be lost, the wages are gone; but whatever shall be saved of ship and freight is pledged for the payment of wages. The ship-owner is personally liable for the wages of the crew; and his ship and its

freight, as between him and the seamen, are equally liable for the payment. In this case, after the disaster, there was an abandonment by the ship-owner of the interest of the freight insured to the defendants, and accepted by them, which operated as a voluntary transfer of the freight by him, entitling him to receive the full value thereof as if earned. The defendants, as abandonees, acquired the entire interest in the subject insured, and were entitled to the salvage, subject only to such claims as are legally and equitably chargeable as against insurers. After the abandonment, the owner saved from the fragments of the vessel more than sufficient to satisfy the wages; and also as much of the cargo as produced freight to the amount of $4,276.37, which he collected. There was, therefore, enough of savings from either source to pay wages; and the point is, as between the plaintiff and defendants, who should answer for them. Two considerations naturally arise in determining the question: 1st. Are the savings of the ship or the freight primarily liable to wages? and 2d. What are the charges subject to which an insurer takes a subject on abandonment? There is very little authority on the question, whether the salvage of ship or freight are to be primarily resorted to for the payment of wages, when the salvage of either is sufficient to satisfy them. Undoubtedly the seaman has a lien upon both, and may pursue it; but I am not aware of any decision or principle of maritime law to require him to primarily enforce his lien on freight savings when there shall be enough of the savings of the ship to satisfy it; or, where no disaster befalls the ship and freight is earned, that he must first resort to the freight, and not to the ship, for his wages. The mariner's contract and lien have a prior origin as to the ship than as to the freight. The lien commences on the ship before the freight is earned, and endures even if freight is not saved sufficient to pay wages, provided he stay by the ship; and what is rescued is first liable to pay wages. The ship is naturally the first object looked at by the mariner as a pledge. It is a visible, certain subject, which he can appreciate, and with which he contracts, and, as we all know,

practically, to which he first resorts. Freight, being the earnings of the ship in the course of the voyage, is the natural fund out of which the wages are contemplated to be paid; but the ship is also bound by the lien of wages, and, as between the owner and seaman, the former being the proprietor both of ship and freight, the latter is not driven primarily to the freight for indemnity; nor can I see upon what principle the freight should be first exhausted, and the vessel only resorted to when it proves insufficient. In the case of *The Dawn* (Davies, 121), it was said by Judge WARE that, "where the interests of third parties are involved, as between underwriters when the ship and freight are insured by separate policies, it would seem, upon principles of natural law, that the freight ought first to be exhausted, and the vessel resorted to only as a subsidiary fund when the freight proves insufficient." What principle he refers to is not clear, unless it be that which he had previously enunciated, that "freight is indeed the natural fund for the payment of wages; and the seamen have a privileged claim against it." If it should be conceded, however, that, by any principle of maritime law, as between insurers of the ship and insurers of the freight, the freight is the primary fund for the payment of the seamen's wages, it would not follow that, as between the owner of the ship and the abandonee of the freight, the principle would apply. The ship-owner is the absolute proprietor, both of ship and freight; and, when he parts with freight for its full value, cannot be supposed to create a lien in derogation of his grant. If there were an incumbrance embracing the whole subject, by the ordinary equity it becomes a primary charge on what is retained by the grantor. If, before the disaster, the ship-owner in this case had granted the pending freight to third persons, it would have implied the obligation on his part to pay all the ordinary expenses of earning the freight. The disaster occurring can only vary this obligation by subjecting the grantees to the extraordinary expenses growing out of the disaster. On principle, therefore, it would seem to me plain that the ship and the remnants saved should bear the wages in preference to abandoned freight.

2. When there has been an abandonment of freight, the salvage belongs to the insurers. The subject may, however, be incumbered by charges for which the insurers are answerable, and which loss they must bear. What are the burdens, charges, or liens upon the salvage that the abandonees of freight are subject to, and must bear? Only such as are created by the occurrence of the peril insured, and not those which, in the ordinary course, would be incurred by the subject, whether the peril had happened or not. Writers on maritime law and insurance declare it to be an elementary principle that the insurers are only to pay liens arising from the peril insured, and not from perils not insured against. Parsons, in his treatise on Maritime Law, says: "The salvage of course belongs to the insurers; but if it be incumbered by any charge or lien by a peril against which they have insured, they are, of course, answerable for this, and bear the loss. But if the salvage have burdens, charges or liens upon it, springing from perils which are not insured against, this must be the loss of the insured, who must discharge their burdens, or pay or allow to the insurers the sum they pay, or are bound to pay." (2 Pars. Mar. Law, 418.) So, also, it is said in Arnould on Insurance: "The abandonees of freight take as salvage the net proceeds of the freight ultimately earned, after deducting the cost of reloading the cargo on board, and the other expenses of earning the freight rendered necessary by the casualty; but the same rule does not extend to incumbrances or liens with which the property is burdened by the assured by contracts with third parties before the casualty took place, and not arising out of the perils insured against." (2 Arn. on Ins., 1183, Am. ed.)

By the abandonment, the insured, I think, in this case, became a trustee for the insurers as to all the subject insured which might come to his hands afterwards, and subject only to such claims on his part as were legally and equitably chargeable as against the insurers. The mariners' wages were not a charge of that description. It was not a burden springing from any peril against which the underwriters had insured.

Daniels *v.* The Atlantic Mutual Insurance Company.

They did not guarantee the insured on freight against the wages by the aid of which, in part, it was earned; but the wages were an incumbrance, or lien, with which the assured had burdened the property before the casualty took place, and not arising out of the peril insured against. It was a burden created by the ship-owner on his vessel and freight. By the abandonment of the freight insured, he, in equity, transferred to the insurers, not as a mere incident to the ship, but as an independent subject, capable of separate existence, and to be separately regarded, the existing freight, and received its full amount from them as if it had been earned. It would be contrary to principle that he should deduct any part of the ordinary charge of earning it. He should discharge the burden himself, or pay or allow to the insurers the sum they pay, or are bound to pay.

My conclusions are, that the seamen's wages should not have been deducted from or paid out of the freight, but out of the savings of the ship. The freight apportioned to the ship was $2,565.70; exceeding the unpaid part of the sum insured by $65.70.

The order of the Superior Court granting a new trial should be affirmed, and judgment absolute rendered against the plaintiffs.

DENIO and GOULD, Js., concurred with ALLEN, J.; SMITH, J., concurred with WRIGHT, J.; DAVIES and SUTHERLAND, Js., were also for affirmance.

> Judgment absolute for defendants, and case remitted to ascertain the amount due them for overpayment.