## THE PONCE.

### (District Court, E. D. New York. April 19, 1902.)

COLLISION—STEAMSHIPS—EVIDENCE CONSIDERED.

> While the steamship Cambridge, with passengers, was lying at rest with other vessels awaiting the starting of the racing yachts in the vicinity of Sandy Hook lightship, the steamship Ponce approached astern and on the starboard side. When she was 150 feet distant, coming directly toward the Cambridge, and having made no signal, the Cambridge blew an alarm signal, and started ahead with a port helm. The Ponce also blew an alarm, but came ahead, although with reversed engines, striking the Cambridge on the starboard side a little aft of amidships. *Held,* that the Ponce was clearly in fault for the collision, and that the Cambridge was not in fault for her attempted maneuver after collision became inevitable, it not appearing, moreover, that her action was not proper under the circumstances.

Black & Kneeland, for libelants.
Wing, Putnam & Burlingham, for claimants.

THOMAS, District Judge. The Cambridge, a three-decked steamship, about 185 feet in length, carrying passengers, was awaiting the starting of the racing yachts in the vicinity of Sandy Hook lightship, on October 7, 1899. The course of the race was S. S. W. from the lightship, to the westward of which line at all times were the Cambridge and Ponce and many other vessels, heading in a southerly direction. The wind was light from the N. N. E., accompanied by a considerable swell to the westward. Under such circumstances the Ponce, a steamship 335 feet long and 42 feet beam, had been approaching from the vicinity of Sandy Hook, astern and on the starboard side of the Cambridge, and when some 1,000 feet away was heading upon the latter at a point at least abaft the pilot house. Meantime for some 10 minutes the engines of the Cambridge had been at rest, but the wind and swell had carried her slightly to leeward, and were continuing to do so very slowly. The Ponce continued to advance upon the Cambridge, and when some 150 feet away was discovered by passengers located aft of the pilot house, who called the attention of a person in the pilot house. Thereupon the Cambridge gave an alarm whistle, and started up under a hard-aport wheel; but the Ponce, giving an alarm whistle at about the same instant, came forward, although with reversed engines, and struck the Cambridge a little aft of amidships on the starboard side, making at the time of contact an angle something less than a right angle. The Cambridge, like all the other vessels, was, and for some time had been, motionless, save as she made slight leeway, and the Ponce bore down upon her through a considerable distance, giving no signal of her approach until the collision was inevitable. There is no hesitation in attributing culpable negligence to the Ponce, and if the conclusion needs confirmation it accrues from

the incredible evidence of Lloyd, the captain of the Ponce, who was on the bridge of the vessel. He testified that the two vessels were heading about S. S. W., with the Cambridge, if anything, heading more to the westward, about abeam of the Ponce, and a thousand yards away; that the vessels remained in this relative position some 10 or 15 minutes; and that as those on the Ponce "didn't see anybody aboard the Cambridge, and she was falling off in the trough of the sea and coming near, our pilot blew our whistle several times to call their attention, but nobody seemed to pay attention, but the first thing we saw a man come putting her helm hard aport, full speed ahead, so far as I know, and she came across our bow about ninety degrees"; that the Cambridge was about 1,000 yards away when the Ponce blew her whistle; that when the Cambridge started ahead she was somewhere 300 or 400 feet away; that the Ponce thereupon blew three times, and her engines were put full speed astern; that the Ponce still had way, and hit the Cambridge behind her pilot house abaft of amidships; that the Cambridge was going 10 or 11 knots at the time of the collision; and he stated: "Q. You think it was ten minutes from the time she started ahead to the collision? A. I think so; five to ten minutes."

Thus, it appears from the evidence of this witness that, while the engines of the Ponce were stopped abeam of the Cambridge (in another place he says the Cambridge was about two points before the beam of the Ponce) for 10 or 15 minutes, the Cambridge drifted some 2,600 feet to leeward, and then, when the vessels were about 400 feet apart, the Cambridge started up and acquired a rate of speed of 10 or 11 knots an hour, made a change of heading of nine points, and ran right across the bow of the Ponce. This story from the captain of the Ponce is at utter variance with the evidence of disinterested witnesses called by the libelants, that the Ponce was bearing down upon the Cambridge, and near to her, before the latter moved ahead at all, and that she went an inconsiderable distance.

But it is urged that the Cambridge was in fault in porting and going ahead. The Ponce was approaching in such manner that the navigator of the Cambridge hoped to throw her stern out of the way. Of course, the attempt was fruitless. But what should the Cambridge have done? O'Brien, the pilot of the Ponce, states that she should have "laid right still," or by starboarding straightened up and gone ahead. Sargent, the Ponce's first officer, says the same. Capt. Sukeforth, the master of the steamship Finance, and at the time a guest on the Ponce, assented to the danger of starboarding and throwing the vessels nearer together, and stated that the Cambridge should have reversed and gone astern. Those on the Cambridge give reasons for porting that seem as acceptable as any advanced by the Ponce for a different maneuver. But the offending vessel always accuses. What was done by the unoffending vessel in the high peril which the offending vessel's wrongdoing had brought shows the reverse of beneficial action. If the injured vessel moved, then she should not; if she remained at rest, she should not; if she went forward, she should have gone astern; if she reversed, it was the height of unskillfulness; and so the delinquent seeks to escape, in whole or in part, from the results

of his own wrongdoing. Such contention, although not always unavailing, is seldom absent, and in the present instance it should not be upheld.

The libelants should have a decree.