### THE MUNRIO.

### THE TEJON.

(District Court, N. D. California, Third Division. March 1, 1926.)

Nos. 18031, 18082.

1. **Collision** ⟨⇒⟩82(2)—**Steamer encountering fog must reduce speed, so it can stop in time to avoid collision with properly approaching vessel coming in sight (International Rules, art. 16 [Comp. St. § 7854]).**

Under paragraph 1 of article 16 of International Rules (Comp. St. § 7854), steamer encountering fog must reduce speed, so that she can stop in time to avoid collision with a properly approaching vessel, after it comes in sight.

2. **Collision** ⟨⇒⟩82(2)—**Negligence of steamer, colliding in fog with vessel lying across her bows and barely moving, is demonstrated by nonobservance of rule as to speed in fog, and inability to stop in time after vessel came in sight.**

It is sufficient demonstration of negligence of steamer, colliding in fog with another vessel lying across her bows and barely moving

towards her, that she had not observed the rule as to speed in fog, and could not stop in time after coming in sight.

**3. Collision �every⟶82(2)—Duty of steamer to stop engines on hearing fog signal of vessel ahead is absolute (International Rules, art. 16 [Comp. St. § 7854]).**

Duty imposed by second paragraph of article 16 of International Rules (Comp. St. § 7854) on steamer to stop her engines on hearing, apparently forward of her beam, fog signal of vessel, position of which is not ascertained, is absolute.

**4. Collision ⌚⟶125—Fault of one vessel being obvious and inexcusable, evidence of that of other, to make out case for apportionment, must be clear and convincing.**

Where fault on part of one of colliding vessels is obvious and inexcusable, as full speed in fog in known proximity to other vessel, evidence to establish that of other must be clear and convincing to make out case for apportionment.

**5. Collision ⌚⟶82(1)—Excusability of changing course without knowing exact position of vessel approaching in fog depends on circumstances of case.**

Whether it is excusable for a vessel to change her course while ignorant of the exact position of another approaching in the fog depends on the circumstances in each case.

**6. Collision ⌚⟶82(1)—Under circumstances, it could not be said one of colliding vessels was negligent in changing course on hearing fog signal of other.**

It being possible that, under the circumstances of her position, one of two colliding vessels, on her way south from Coos Bay, when she heard the fog whistle of the other at a distance, had a right to assume that the other was inshore of her, and off her port bow, her change of course, two points to starboard, may not be held to have been negligent, at least where fault of the other, in maintaining excessive speed, is obvious and inexcusable.

**7. Collision ⌚⟶82(1)—Any fault of one vessel changing her course just before the vessels came in sight of each other held, under circumstances, not to have contributed to collision.**

Any fault of one of the colliding vessels in changing her course just before they came in sight of each other in the fog did not contribute to the collision, where she was barely moving, and the facts conclusively show that the speed of the other could not have been in proper control, and that, even had she been dead in the water, she would have been run down by the other.

**8. Collision ⌚⟶81—It is enough for vessel to follow two-minute rule for fog whistles.**

It is enough for vessel to follow the two-minute rule for fog whistles, adapted to vessels which navigate at proper speed, though it be not adequate for another vessel moving at excessive speed.

**9. Collision ⌚⟶108—Full speed ahead in attempt to avoid collision, when imminent through fault of other vessel, not contributing to accident, may be justified, and, if faulty, is error in extremis (International Rules, art. 27 [Comp. St. § 7866]).**

For vessel to go ahead at full speed in attempt to avoid collision, when it was imminent through faulty navigation of the other, may be justified under International Rules, art. 27 (Comp. St. § 7866), and, if a faulty maneuver, was error in extremis, and, not contributing to the accident, may for that reason alone be disregarded.

In Admiralty. Two libels, one by the General Petroleum Corporation against the American steamship Munrio and another, the Munrio Steamship Corporation, claimant; the other by the Munrio Steamship Corporation against the American tanker Tejon, the General Petroleum Corporation, claimant. Decrees for owners of the Munrio.

Ira S. Lillick and Hunt C. Hill, both of San Francisco, Cal., for the Munrio and its claimant.

Farnham P. Griffiths and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., for the Tejon and its claimant.

KERRIGAN, District Judge. These are two libels, brought to recover for damage which resulted from the collision of two vessels near Cape Mendocino on October 14, 1923.

The steamship Munrio, the more severely injured of the two, was on her way southward from Coos Bay, holding a course 2 degrees eastward of due south. At 7:34 a. m. she was proceeding in dense fog. At that time she stopped to take a sounding, and after doing so went ahead slowly until 7:46, when the fog signal of an approaching vessel was heard, apparently dead ahead and some distance off. According to the testimony of several witnesses, her engines immediately were stopped.

About three minutes later the whistle of a third vessel became audible, apparently several points off the port bow. The Munrio thereupon went ahead again at a slow rate of speed, at the same time changing her course about two points to starboard. At 8:01, in response to dangerously nearing fog whistles, she was swung four points further in that direction. A minute later the Tejon loomed up, 300 feet away, two points forward of the port beam, and heading for the bridge. The Munrio's engines were put full

speed ahead and her wheel hard aport; but before the effect of this maneuver could be felt she was struck amidships and nearly sunk.

The Tejon is an oil tanker, 430 feet long, and at the time of the accident was heavily laden with a cargo of oil in bulk. At 7:45 a. m. she was on a true course of 358 degrees, exactly parallel to that of the Munrio, when the latter vessel's whistle was heard on her *starboard* bow. Although navigating in thick fog, she continued to run, as she had been running for some time, at full speed. At 7:50 her speed was reduced to half, and at 7:56 to slow; but it was not until 8:02, when the Munrio was sighted, with her entire port side in view, that her engines were stopped. At 8:03 she went full speed astern, but not in time to avert collision, which had become inevitable.

Each vessel denounces the other as having been entirely at fault. Article 16 of the International Rules of the Road (Comp. St. § 7854) provides that "every vessel shall, in a fog, * * * go at a moderate speed, having careful regard to the existing circumstances and conditions"; also that "a steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained *shall, * * * stop her engines,* and then navigate with caution until danger of collision is over."

[1] That the Tejon was guilty of a double violation of this rule is conclusively established by the testimony of her own witnesses. From 5:52 until the vessels met, she was continuously in dense fog. Paragraph 1 of the rule quoted, as interpreted by the courts, required her, two hours in advance of the accident, so to reduce her speed as to make it possible for her to stop in time to avoid collision with any properly approaching vessel, upon coming in sight of it. The Conner (D. C.) 300 F. 827, 830, and cases cited; The Belgian King (C. C. A. 9) 125 F. 869, 876, 60 C. C. A. 451. She was, in the language of the case last cited, "bound to observe unusual caution, and to maintain only such a rate of speed as would enable her to come to a standstill by reversing her engines at full speed before she could collide with a vessel which she could see through the fog." Instead of doing so, from 7:11 until 5 minutes *after* hearing the first whistle of the Munrio, she ran at full speed of at least 9 miles per hour, dropping down for the next 6 minutes to half speed, which of itself was clearly excessive.

In the Belgian King, supra, the vessel of that name had run through fog for 15 minutes at 8½ knots per hour before hearing the whistle of an approaching vessel forward of her beam. The engines immediately were put at slow, and 5 minutes later were stopped and reversed. A collision occurred 2 minutes afterwards. It was held, as I think it must be held here, that, had the offending vessel properly reduced speed when fog was encountered, she would have been able to avoid the accident.

[2] In the present case all hands are agreed that, when struck, the Munrio lay almost squarely across the Tejon's bows. Her progress through the water in the direction from which that vessel was coming was negligible. It therefore is apparent that the momentum gained by the Tejon during 39 minutes of unjustifiable full speed, aided by 12 minutes of slower steaming, was too great to be checked within the limited distance of visibility. This of itself is sufficient demonstration of negligence. The Manchioneal (C. C. A. 2) 243 F. 801, 805, 156 C. C. A. 313.

[3] But the Tejon's inexcusable failure to stop her engines on hearing the Munrio's first fog signal was an even more obvious fault. The second paragraph of rule 16 imposed an absolute duty upon her to do so, violation of which may not be ignored (The Beaver [C. C. A. 9] 219 F. 134, 137, 135 C. C. A. 32; Lie v. San Francisco & Portland Steamship Co., 37 S. Ct. 270, 243 U. S. 291, 296, 61 L. Ed. 726), and with which during a space of 17 minutes admittedly no attempt whatever was made to comply. Hence in two important particulars she was guilty of highly culpable negligence.

[4] The remaining question is: Was the Munrio, under the circumstances of her position, at fault in changing her course? Her witnesses all claim that, when they first heard the Tejon's whistle, it seemed to be coming from dead ahead. But inasmuch as at that time the courses of the vessels were exactly parallel, had this been true, any substantial change by either would have prevented their coming together. The only conclusion to be drawn from subsequent events is that at 7:46 the Munrio was about half a mile eastward of the Tejon's path of navigation, and that her changes of course, instead of bringing that vessel abeam, had an opposite result.

It is urged that these changes of course were made without regard to their probable effect, that they proximately contributed to the accident, and that, had either of them been omitted, the vessels would have passed in safety. More specifically, the charge is that the Munrio's action carried her obliquely across the lane of north-bound traffic; that

she speculated on the position of fog whistles, the position of which she had not ascertained, and in attempting to avoid them placed herself almost at right angles to the usual path of navigation, thus exposing herself to injury. The second paragraph of article 16 is invoked, and it is vigorously asserted that, after her engines had been stopped, the Munrio did not "navigate with caution until danger of collision is over."

If the record contained even slight palliation of the Tejon's own disregard for this rule, her argument might seem to come with a better grace. "But the offending vessel always accuses. What was done by the unoffending vessel in the high peril which the offending vessel's wrongdoing had brought shows the reverse of beneficial action. If the injured vessel moved, then she should not; if she remained at rest, she should not; if she went forward, she should have gone astern; if she reversed, it was the height of unskillfulness; and so the delinquent seeks to escape, in whole or in part, from the results of his own wrongdoing." The Ponce (D. C.) 116 F. 55, 56. Significantly, the rule laid down repeatedly by the Supreme Court is that, where fault on the part of one vessel is obvious and inexcusable, the evidence to establish that of another must be clear and convincing to make out a case for apportionment. The City of New York, 13 S. Ct. 211, 147 U. S. 72, 85, 37 L. Ed. 84; The Ludvig Holberg, 15 S. Ct. 477, 157 U. S. 60. 71, 39 L. Ed. 620; The Umbria, 17 S. Ct. 610, 166 U. S. 404, 409, 41 L. Ed. 1053; The Victory, 18 S. Ct. 149, 168 U. S. 410, 423, 42 L. Ed. 519.

No contention is made that the Munrio committed any act specifically prohibited by the International Rules, or that she failed to do any act made mandatory by them. On the other hand, full speed in a fog, in known proximity to another vessel, is so gross a fault that the Munrio's negligence must be made very clear before she will be condemned. The Umbria, supra.

[5] It may, of course, be argued that a vessel ought never to change her course (without reversing) while ignorant of the exact position of an approaching vessel. In three cases decided by Judge Brown there are intimations to this effect (The Alberta [D. C.] 23 F. 807, 811; The City of Atlanta [D. C.] 26 F. 456, 461; The Wyanoke [D. C.] 40 F. 702, 704), and there are others which lend authority to such a view. But in The Umbria, speaking for the Supreme Court, Judge Brown himself declared that there was no rigid rule applicable to such cases,

and approved a decision of the House of Lords that each must depend on its own circumstances, which may or may not be sufficient to excuse the action complained of. The Vindomora, [1891] App. Cas. 1.

[6] The first change of course made by the Munrio was almost identical with that of the Iberia in the Umbria. The officers of the latter vessel heard the Umbria's first whistle about two points on their port bow, and immediately put her head two points more to starboard. Without this maneuver collision might have been avoided. But the court held that, although it would have been more prudent for the Iberia not to have changed her course until the position and course of the Umbria had been definitely ascertained, "yet in view of the fact that the whistle of the Umbria appeared to come from off her port bow, we should be unwilling to say that it was necessarily a fault on her part to port her helm two points, the effect of which would be to give the Umbria more room."

[7] It is possible that under the circumstances of her position, five miles north of Blunt's Reef, the Munrio had a right to assume that the Tejon was inshore of her, and off her port bow, just as it was possible that the Iberia had a right to assume that the Umbria was pursuing a course substantially parallel to her own. For this reason, the Munrio's first change of course may not be held to have been negligent. The Belgian King (C. C. A. 9) 125 F. 869, 877, 878, 60 C. C. A. 451; The Umbria, supra. Her second change, which was made but a single moment before the vessels came in sight of each other, might be excused on similar grounds; but it is unnecessary to excuse it at all.

While a majority of the Supreme Court were of opinion that the Iberia was not at fault in changing her course, other of its members believed that (even if such were not the case) her negligence did not contribute to the collision. As far as progress in the direction of the Tejon was concerned, up to her final full speed ahead movement, the Munrio virtually was stopped. To be exact, her speed, which was barely 3 miles an hour, was carrying her southward, and across the Tejon's path at an angle of 70 degrees, with only a third of her actual speed, or 1 mile per hour. Bowditch, table 2. Yet the crash made by the impact of the vessels, not only was loud enough to be heard on the Culburra, more than 400 yards away, but was so loud as to cause that vessel to stand by and clear away her lifeboats, thinking that the Munrio had been sunk. The mere

facts seem to prove beyond question that the Tejon's speed could not have been in proper control, and that, even if the Munrio had been dead in the water, the Tejon would have run her down.

It is further contended that the evidence fails to disclose that a lookout was on duty on board the Munrio at the time of the accident, and it is admitted that efforts to produce him were unavailing. I am satisfied that a lookout was on duty, and equally convinced that, had there been none, his absence would not have contributed to the collision. The master of the Munrio testified that he had a lookout stationed on the forecastle head. No attempt was made to cross-examine him upon the point, or to elicit any information as to how he knew the lookout was there. I cannot find a shred of evidence in the record from which the deduction may fairly be made that his testimony was incorrect.

[8] It also has been argued that the Munrio did not sound proper fog signals. Her witnesses testified that the whistle was sounded regularly, and none of those produced by the Tejon could swear that there was more than a two-minute interval, as required by the rule, between the blasts which were heard by them. Yet it is alleged that the Munrio "did not conform to the salutary practice of careful navigators by *shortening* the interval, so the approaching vessel could definitely locate her, and ascertain what she was doing."

Such an excrescence, in my opinion, should not be grafted on the rule, which is a sufficient standard of due care. Additionally, it is to be observed that this "custom of careful navigators," not only has been established by men guilty of flagrant violations of the express provisions of article 16, but that it is supported by at least one master mariner who regards full speed in a fog as good seamanship. The two-minute rule for fog signals, of course, has been adapted to vessels which navigate at proper speeds. The fact that it is inadequate for those which do not is insufficient ground for its amendment by the courts.

[9] The Tejon's final contention is that the Munrio was at fault for going ahead at full speed when collision was imminent. To this there are several answers. Article 27 (Comp. St. § 7866) provides that, in obeying the other rules, due regard shall be had to any special circumstances which may render a departure from them necessary in order to avoid immediate danger. It justifies an attempt to save a vessel when by rigid adherence to rules she could not be saved from injury, and in fact makes such adherence in some cases negligence. Secondly, if the Munrio's ultimate maneuver was faulty, it was error in extremis. Lastly, it did not contribute in any way to the happening of the accident, and for that reason alone may be disregarded.

It follows that the owners of the Munrio are entitled to a decree against the owners of the Tejon for full damages, and that the libel against their vessel must be dismissed. It is so ordered.